**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kurt Thomas CHASE, Billy Ray Nelson, Omar Mesa, and Bernardo Mesa, Defendants–Appellants.**

**No. 87–1281.**

United States Court of Appeals, Fifth Circuit.

Feb. 12, 1988.

---

Bruce Anton, Dallas, Tex. (Court–appointed), for Chase.

John Hagler, Dallas, Tex., for Nelson.

Miguel A. Orta, Miami, Fla., for Omar Mesa.

Michael S. Griffin, Michael J. Rogers, (Court-appointed), Cleburne, Tex., for Bernardo Mesa.

Sidney Powell, James T. Jacks, Asst. U.S. Attys., Dallas, Tex., for plaintiff-appellee.

Before RUBIN, WILLIAMS and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Three of the four appellants were participants in a large organization that imported and distributed cocaine in the Dallas area. The fourth appellant, Kurt Thomas Chase, was charged with participation in the organization but convicted only of simple possession of cocaine. Originally tried with three other defendants, the four appellants appeal their convictions on various counts of possession, distribution, and conspiracy to possess with intent to distribute cocaine. For the reasons discussed below, we affirm all four convictions.

## I.

Because the appellants present numerous and distinct arguments of errors in the trial, we give only an outline of the background facts at this time and will discuss the facts in more detail later as needed to understand the individual assignments of error.

The common figure linking all of the appellants is Al Litton, a cooperating co-conspirator who was the government's star witness. Litton moved to Florida in 1980 and in October 1981 he met Adriana Morales, a Colombian visiting in the United States. They were later married. Adriana's father was allegedly one of Colombia's largest cocaine suppliers. Beginning in September 1982, Al and Adriana Litton began smuggling cocaine into the United States. They supplied a number of wholesalers in the Dallas area, including nightclub owner James Ragland.

While Al Litton was in Colombia visiting Adriana's parents in December 1983, Bernardo Mesa, Adriana's brother-in-law, began furnishing cocaine to Litton, who in turn sold it to Ragland and others. When Litton collected the purchase price for the cocaine from Ragland or Ragland's agent, Vincent Collette, he remitted the money to Bernardo. Collette flew to Miami every

two or three weeks from February through November 1984 and obtained cocaine from Al and Adriana Litton, which they in turn had obtained from Bernardo Mesa. In the spring of 1984, Al and Adriana Litton moved to Dallas but the deliveries to Ragland's agent Collette in Miami continued. During this time Omar Mesa and Adriana's sister, Doris Moreno, began supplying cocaine to Ragland.

Critical to the prosecution of Omar Mesa was a transaction in late September 1984. During that transaction, Omar and a Colombian, known only as Diego, delivered six kilograms of cocaine to an apartment in Miami being used by Doris and Vidal Moreno. Collette purchased the six kilograms of cocaine from Omar Mesa and Diego for $110,000.

The other appellants are below Omar Mesa and Bernardo Mesa in the distribution chain. Billy Ray Nelson first began buying cocaine from Ragland in late 1983 or early 1984. Nelson usually bought about four ounces from Ragland when Ragland received a new shipment.

Kurt Chase worked at a Taco Inn for one of Ragland's partners, Ramsey. Chase bought cocaine on numerous occasions from Ramsey, but always in small quantities. Chase was an admitted weekly user of cocaine; the evidence was conflicting as to whether he ever sold the drug.

With this background, we turn to the issues presented by each appellant.

## II.

### A. KURT CHASE

■ Chase was charged with conspiracy to possess cocaine with intent to distribute (Count 1)[1] and two counts of possession of cocaine with intent to distribute, once in October 1984 (Count 24) and again in February 1985 (Count 29). He was acquitted on Counts 1 and 29, but the jury found him guilty of simple possession of cocaine as a responsive verdict to the larger offense charged in Count 24.

Chase's principal argument is that the district court erred in allowing the jury to consider his guilt of simple possession of cocaine as a responsive verdict to possession with intent to distribute charged in Count 24. Chase contends that the government is not entitled to a verdict on the lesser included offense of possession because the government's evidence and argument in this case—that Chase sold cocaine—is fundamentally inconsistent with simple possession of the drug.

The government undoubtedly sought to prove that Chase not only purchased cocaine but also sold it. Joy Fife, Ramsey's girlfriend, testified that during 1984 she "fronted" (or delivered on consignment) one-quarter ounce of cocaine to Chase. Ramsey testified to similar transactions on fifteen to twenty occasions but gave no time frame for those deliveries. Steve Perkins testified that he bought small quantities of cocaine from Chase approximately six times between 1982 and 1985. Both Ramsey and Perkins testified that ordinarily the fronting or consignment arrangement was one they had with dealers who paid for the cocaine after they sold it. However, the government's evidence that Chase distributed cocaine was not unequivocal. Steve Perkins, working as a government informant, attempted to make a controlled purchase of cocaine from Chase but was never able to do it. Fife at one point in her testimony admitted that one-quarter ounce of cocaine can be consumed in one evening at a party. Several of the government's witnesses testified they had used cocaine with Chase but never saw him sell any of the drug. Grimes saw him sell cocaine before 1981 but not after that date.

Chase's defense was predicated almost entirely on his contention that, though he used cocaine weekly, he did not sell or distribute it in any fashion. Although Chase denied possessing one-quarter ounce of cocaine on the date charged, he admitted receiving cocaine from Ragland, Larry Ramsey, and Vincent Collette on a number

1. All four appellants were charged in this count and this charge may sometimes be referred to simply as the conspiracy count.

of occasions. Chase also admitted using cocaine with Steve Perkins and Joy Fife. Ron Stoneseiffer, a former Dallas policeman, testified for the defense that he knew Chase used cocaine but Chase did not sell it. Thus, the battlelines in Chase's case were drawn not over whether he possessed cocaine but whether he sold or distributed it.

It is undisputed that simple possession of cocaine is lesser than and wholly included within the crime of possession with intent to distribute. *See United States v. Garcia–Duarte*, 718 F.2d 42, 47 (2nd Cir.1983). To establish the crime charged, the government was required to prove two distinct elements: that Chase possessed cocaine on or about the date charged in the indictment and that he intended to distribute it. The government's evidence in this case on proof of Chase's intent to distribute was not incompatible with its proof of his simple possession of cocaine. Chase's reliance on *United States v. Payne*, 805 F.2d 1062 (D.C.Cir.1986) and *United States v. Pirolli*, 742 F.2d 1382 (11th Cir.1984), *cert. denied sub. nom.* 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985) is misplaced. In both cases the prosecution was predicated on evidence that the accused had large quantities of drugs in his possession. In *Payne*, the government's evidence revealed that the accused had forty pounds of marijuana and associated paraphernalia in his apartment and Payne was observed throwing a large amount of marijuana out of his window. The court properly held that this evidence was inconsistent with guilt of simple possession. In *Pirolli*, the accused possessed a pound of cocaine, an amount the court considered too large to attribute to personal consumption. Both of these cases are readily distinguishable from the instant case. The government did not contend that Chase possessed a large quantity of cocaine in October 1984; the government's evidence established that Joy Fife delivered one-quarter ounce of cocaine to Chase on or about the date charged.

The court in *Payne* stated the rule that governs the instant case: "[E]ven where the defendant presents a totally exculpatory defense, the [lesser included offense] instruction should nevertheless be given if the prosecution's evidence provides a 'rational basis' for the jury's finding the defendant guilty of a lesser offense." *Payne* 805 F.2d at 1067. A rational jury was entitled to find from the evidence that Chase intended to consume the one-quarter ounce of cocaine he obtained from Joy Fife rather than distribute it. The district court did not err in instructing the jury to consider simple possession of cocaine as a lesser included offense and the jury had a rational basis for finding Chase guilty of this lesser included offense.

■ Chase argues next that the trial court erred in refusing to give the jury an adequate instruction to guide the jury's consideration of "extrinsic" evidence of his use of cocaine at times other than October 1984, the period covered by Count 24 of the indictment. The court gave the following instruction in its final charge:

> The defendants are on trial here for the offenses set forth in the indictment. In order for you to find defendants guilty of the crimes alleged, the government must prove each of the elements of the crime beyond a reasonable doubt. The government has offered testimony and exhibits regarding matters not charged in the indictment as crimes or offenses. This evidence, even if you find it to be believable, in whole or in part, is not evidence that defendants committed the crimes charged in this case but is only background information to assist you in determining matters such as the defendants' motive, opportunity, intent, preparation, plan, knowledge, or identity. The defendants are on trial only for the charges in the indictment. Do not convict them if the government has failed to prove these charges beyond a reasonable doubt.

Chase contends that the district court should have connected its cautionary instruction to the testimony of each witness who testified to Chase's cocaine use. Assuming without deciding that the testimony about Chase's drug use outside the indictment period is "extrinsic" evidence of other crimes within the meaning of Rule 404(b)

of the Federal Rule of Evidence,[2] the court's charge was adequate.

## B. BERNARDO MESA

Bernardo Mesa was convicted of conspiracy (Count 1); three counts of aiding and abetting the possession of cocaine with intent to distribute on February 17, 1984 (Count 3), on March 29, 1984 (Count 5), and on April 28, 1984 (Count 7); and three counts of aiding and abetting travel in interstate commerce with intent to distribute the proceeds of an unlawful activity, in violation of 18 U.S.C. § 1952 (Counts 4, 6, 8).

Bernardo Mesa complains first that the trial court erred in admitting evidence of his participation in two drug transactions that were not the subject of a specific substantive charge in the indictment, though the transaction took place during the conspiracy period charged in Count 1. As with Chase's argument on this point, *see supra* Note 2, this evidence was not "extrinsic" as to the conspiracy count and we do not address whether the evidence is "extrinsic" as to the substantive counts within the meaning of Federal Rule of Evidence 404(b). Assuming without deciding that it is extrinsic, the district court's cautionary instruction quoted above was adequate.

■ Although he made no contemporaneous objection, Bernardo Mesa also complains that the trial court erred in admitting the transcript of a tape recorded conversation among Al Litton, Adriana Litton, and Bernardo Mesa without properly authenticating the transcript. He further argues that the court should have instructed the jury to disregard any portion of the transcript where the jury found the actual recording to be inaudible or unintelligible.

This contention is entirely meritless. Al Litton testified to the accuracy of the recording, identified the voices, and verified the correctness of the transcript. The court allowed the transcript to be used solely to assist the jury in following the recording. It was not admitted into evidence. The trial court gave a full instruction to the jury on how it should use the transcript.[3] The trial court did not abuse its discretion in the manner in which it handled the transcripts.

## C. OMAR MESA

Omar Mesa was convicted on the conspiracy count (Count 1) and for aiding and abetting the possession of six kilograms of cocaine with intent to distribute on September 19, 1984 (Count 23).

■ Omar Mesa complains that the trial court erred by admitting coconspirators

---

2. Evidence of Chase's use of cocaine during the conspiracy period charged in Count 1 was not "extrinsic" to that charge. All of the evidence Chase specifically identifies as extrinsic to the substantive offense charged in Count 24 relates to his use of cocaine during the conspiracy period.

3. Just before the jury heard the recordings the court instructed:

> Ladies and Gentlemen, as Mr. Jacks is distributing the exhibit to you, I am going to instruct you that you should listen to these tape recordings and determine as best you can what is on the tapes. These transcripts are given to you only in trying to assist you in determining the speakers on tape as well as what they say. It is up to you to decide whether the transcripts correctly or incorrectly reflect the context of the conversation or the identity of the speakers. If there is any discrepancy between what is on the tape and what is on the transcript, the tape should control. In other

> words, the tape recording is the primary evidence of its contents, and the transcript is given to you solely to assist you in evaluating the primary evidence which is the tapes. If you determine that the transcript is anyway incorrect, then you should disregard it to that extent.

Again in its final charge the court stated:

> I want to remind you that the transcripts I have allowed counsel for the government to distribute to you are only an aid to assist you in determining what is on the tape, and if you could not hear words on the tape that are on the transcript, then you should disregard what is on the transcript to that extent. In other words the transcripts themselves are not evidence of what was said in any of those conversations but merely to assist you in determining what is on the tape, and it is the tape from which you should determine the content of those conversations.

*See United States v. Larson,* 722 F.2d 139, 144 (5th Cir.1983), *cert. denied,* 466 U.S. 907, 104 S.Ct. 1688, 80 L.Ed.2d 161 (1984).

hearsay statements because the government failed to produce sufficient independent evidence of the existence of the conspiracy to justify their admission.

The only alleged hearsay coconspirators' testimony that Omar Mesa points to is Doris Moreno's statement to Al Litton that Omar was her source for cocaine. No objection was made to this testimony. Omar Mesa thus failed to preserve this error for appeal. *United States v. Hamilton*, 694 F.2d 398, 401 (5th Cir.1982). Furthermore, evidence of Omar's participation in the conspiracy was overwhelming.

Al and Adriana Litton testified that Omar Mesa was their source for cocaine from May to September 1984. The Littons testified in detail about one particular six-kilogram transaction in September 1984. According to these witnesses, Omar and two companions delivered the cocaine to Doris and Vidal Moreno's apartment in Bar Harbor, Florida. Litton then allegedly delivered Ragland's money to Omar in one bedroom of Doris' apartment; Litton then delivered Omar's cocaine to Ragland's courier who was in the other bedroom.

Although the offered co-conspirator's statement can be "considered along with the other evidence in determining whether the hearsay declarant was the defendant's co-conspirator," *United States v. Perez*, 823 F.2d 854, 855 (5th Cir.1987); *Bourjaily v. United States*, —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), independent, nonhearsay testimony was ample in this case to establish Omar's participation in the conspiracy. The trial court's findings that a conspiracy existed and that the defendant was a participant in it were not clearly erroneous.

█ Omar Mesa also argues that the evidence was insufficient to sustain his conviction, and the court erred in failing to grant his motion for a judgment of acquittal.[4] The evidence summarized above is sufficient to support Omar Mesa's conviction, and the district court did not abuse its

discretion in denying his motion for judgment of acquittal.

Omar Mesa also complains of prosecutorial misconduct during closing arguments in this case. He specifically objects to four improper arguments: (1) the prosecutor improperly bolstered the credibility of Al Litton by arguing that Litton's initial story to the DEA was the same as his version at trial; (2) the prosecutor improperly insinuated that Adriana Litton was afraid of Omar Mesa and that she was fearful for her family in Colombia; (3) the prosecutor leveled an ethnic slur at the Mesa family when he referred to them as representative of "Columbians [sic] with their cautiousness"; and (4) the prosecutor attacked the integrity of all the defendants by inviting the jury to determine "who had been candid with them."

█ To warrant reversal of a conviction on grounds of a prosecutor's improper jury argument, a court must find that the prosecutor's remarks were both inappropriate and harmful. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 9–10, 105 S.Ct. at 1043–44. The closing argument must be analyzed in the context of the entire case to determine whether it affected substantial rights of the accused. In making this determination, the court should consider the strength of the government's case and the trial court's instructions to the jury. *United States v. Cardenas*, 778 F.2d 1127, 1132 (5th Cir.1985); *United States v. Grubbs*, 776 F.2d 1281 (5th Cir.1985).

█ The prosecutor argued that the substance of Litton's statement, when he first came forward to assist the DEA, was the same as his testimony. This was not improper argument. The prosecutor was responding to attacks by all defendants on Litton's credibility. Litton in his testimony on redirect examination testified that he initially told the agents about all the trans-

---

**4.** Omar's contention that coconspirator hearsay evidence may not be considered in weighing the sufficiency of the evidence is, of course, meritless. *See United States v. Pozos*, 697 F.2d 1238, 1242 (5th Cir.1983).

actions in which he had been involved. The argument was neither outside the record, *United States v. Garcia*, 693 F.2d 412 (5th Cir.1982), nor advanced as the prosecutor's personal opinion, *United States v. Herrera*, 531 F.2d 788 (5th Cir.1976). The district court did not abuse its discretion in overruling the objection to this argument.

■ The prosecutor's suggestion[5] that Adriana Litton was afraid of Omar Mesa was also not improper because Omar Mesa's counsel opened up the subject of Adriana Litton's fear of Omar Mesa in his cross-examination of Adriana. On cross-examination of Adriana Litton, counsel for Omar Mesa asked Adriana in detail about her fear of Omar Mesa and whether her testimony was colored by such fears. Although Adriana denied any fear of Omar, the prosecutor was entitled to comment on that testimony so the jury could evaluate not only her statements but her hesitant manner of testifying. Such an argument did not advance a personal opinion by the prosecutor and was a fair comment on the evidence. The district court did not abuse

its discretion in overruling Omar's objection.

■ Omar's next allegation of improper jury argument concerns the prosecutor's invitation to the jury to consider which side had been more "candid" with the jury in their questioning, presentation of evidence, and summation.[6] Because Omar failed to object to this argument at trial, he did not preserve this point for appeal.

■ We do not interpret the prosecutor's statement about the "Columbians [sic] with their cautiousness" as an ethnic slur. The prosecutor was rebutting Omar's argument that he was visiting his sister Doris at her apartment, while a large drug sale was being consummated.[7] We interpret the prosecutor's reference to the Colombians as a reference to members of the Mesa family who had grown up in the cocaine business and were much too careful to visit or receive visitors in an apartment where drugs were being sold. Even if the remark were inappropriate, this single comment did not reach the level of harmful error. *Young*, 470 U.S. at 11, 105 S.Ct. at 1044;

---

**5.** The prosecutor on rebuttal responded to defense counsel's argument that the government "pulled" answers from Adriana:

> I agree with Mr. Urbano it was like pulling teeth to get her to say anything about the friends of her family. It was interesting to note that Mr. Urbano asked are you afraid of Omar. No, I am not afraid of Omar. Would you expect her to admit it if she was? He didn't ask her if are you afraid of Omar for any of her friends.

**6.** Omar Mesa specifically objects to the following argument:

> One of the things I would ask you is to make a decision in your mind as far as who has been candid with you, and when I am talking about candid I am talking about all the parties, be they witnesses, attorney or whoever. Who's been candid with you in their questioning? Who's been candid in their presentation of evidence? Who's been candid in their recitation of evidence and in their summation? And who has attempted to mislead you or deceive you or misstate the testimony or twist the testimony around or turn it around? Some of that has happened, quite a bit of it has happened during these final summarizations. I don't know if it is unintentional or if it was deliberate. But based on my recollection of the evidence there has been a great deal said that was not said in the evidence or

was not said in the context of the evidence, the way it was represented to you. So I would ask you to keep in mind who has been candid with you.

**7.** The prosecutor argued:

> [I]f you know anything, you know that these persons, particularly the Columbians [sic], with their cautiousness—

At this point, defense counsel objected, and the trial judge overruled the objection. The prosecutor then explained:

> The Columbians [sic] you have heard about in this case, those are the ones I am referring to in the degree of caution that they have shown. Do you believe that they are going to let somebody be there that can be a witness to what is going on that is not involved. Do you think that they will let somebody come in that is not involved and be there. If he says he is just visiting, do you think they would have said, Omar now is a bad time, go get a cup of coffee, come back later. He acknowledges that he was there. Nobody is going to be there unless they are involved. They are not going to allow anybody to be there but for those that are involved. That way everybody has something to lose if something goes wrong. Everybody is in the stew.
> He was there to keep an eye on the cocaine and make sure it got where it was supposed to go.

*United States v. Williams,* 809 F.2d 1072 (5th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987).

Omar Mesa next complains about the severity of his sentence. Omar, who was convicted on Count 1 (conspiracy) and Count 23 (distribution of six kilograms of cocaine), was sentenced to thirty-five years imprisonment and a $25,000 fine. This sentence was within the maximum permitted by the statutes.[8] Omar's primary complaint with respect to his sentence is that his codefendants, who entered guilty pleas and cooperated with the government, received lesser sentences. However, a codefendant's sentence is immaterial to the propriety of a sentence imposed on a defendant. *United States v. Nichols,* 695 F.2d 86, 93 (5th Cir.1982). Indeed, "the government is permitted to encourage guilty pleas by offering substantial benefits to a defendant, and [the appellant] having rejected the offer of a plea bargain, cannot complain that his codefendants received the benefit of a lighter sentence." *United States v. Johnson,* 679 F.2d 54, 58 (5th Cir.1982); *see also Corbitt v. New Jersey,* 439 U.S. 212, 223–24, 99 S.Ct. 492, 499–500, 58 L.Ed.2d 466 (1978).

Omar argues vaguely that the sentencing judge relied on incorrect information in arriving at the sentence imposed. The record does not support this argument. The trial court relied on the jury's finding that Omar supplied six kilograms of cocaine. This finding understandably led the trial court to consider Omar highly culpable. We find no abuse of discretion in the sentencing of Omar Mesa. *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591–92, 30 L.Ed.2d 592 (1972); *United States v. Small,* 636 F.2d 126 (5th Cir. 1981).

### D. BILLY RAY NELSON

Billy Ray Nelson was convicted on the conspiracy Count 1 and for possession of four ounces of cocaine with intent to distribute in July 1985 (Count 94).

Nelson's only argument on appeal relates to the severity of his sentence.[9] Because his codefendants, who pleaded guilty and cooperated with the government, received substantially lesser sentences than he, Nelson argues (as does Omar Mesa) that the court punished him for going to trial. As with Omar Mesa, Nelson's argument is meritless. A codefendant's sentence is immaterial to the propriety of the sentence imposed on another defendant. When leniency is extended to a participant in a criminal enterprise because of his cooperation, the sentence imposed on the defendant who elects to go to trial is likely to be more substantial. Nelson has no legal ground to complain of his sentence. *United States v. Johnson,* 679 F.2d 54, 58 (5th Cir.1982).

### III.

For the above reasons, the convictions and sentences of all appellants are

AFFIRMED.

---

8. Omar faced a maximum sentence of twenty years and a $50,000 fine on Count 1 and fifteen years, a special parole term of three years to life, and a $250,000 fine on Count 23.

9. Nelson was exposed to a maximum possible sentence of twenty years imprisonment and a $250,000 fine on Count 1 and fifteen years imprisonment and a $250,000 fine together with three years to life special parole term on Count 94. He was sentenced to two consecutive five-year prison terms, a three year special parole term, and a fine of $5,000.